UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

LUIS O. SANCHEZ-VAZQUEZ,

                                        Plaintiff,                    11-CV-6590 CJS

              -v-

ROCHESTER CITY SCHOOL DISTRICT
and SUPERVISOR GLEN DUNFORD,
INDIVIDUALLY,

                                        Defendants.

APPEARANCES

For Plaintiff:                  Christina A. Agola, Esq.
                                Christina A. Agola, PLLC
                                1415 Monroe Avenue
                                Rochester, New York 14618

For Defendants:                 Rochester City School District
                                Charles G. Johnson, General Counsel
                                Michael E. Davis, Esq., of counsel
                                131 West Broad Street
                                Rochester, New York 14614

INTRODUCTION

        This is an action for employment discrimination brought pursuant to 42 U.S.C. §

1981 and the New York Human Rights Law ("NYHRL").   Now before the Court is

Defendants' motion for judgment on the pleadings. (Docket No. [#8]).  The application is

granted.

BACKGROUND

        In 1989, Plaintiff began working for the Rochester City School District as a "Driver

and Mover."  Plaintiff was born in Puerto Rico.  Although English is his second language,

he speaks it fluently.  Plaintiff has an accent, but maintains that it never caused him any difficulty during his twenty years of employment at the school district. Complaint ¶ 31; *see also, id*. at ¶ 11 ("[Plaintiff] has always maintained an above average work record with no personnel issues.")

In 2007, Defendant Glen Dunford became Plaintiff's immediate supervisor.  Plaintiff always spoke English to Dunford, but spoke Spanish with Spanish-speaking co-workers, which bothered Dunford. Complaint ¶ 33, 35.  Plaintiff indicates that between 2007 and 2011, Dunford made a number of comments that suggest a discriminatory animus.

In 2008, Plaintiff apparently[1] was speaking to Dunford on the telephone, when Dunford angrily stated, "I need to speak with someone who knows how to speak English!"  Complaint ¶ 14.  After Plaintiff gave the phone to a co-worker, Dunford allegedly said, "Great, now I can speak to someone who actually knows English." *Id*. at ¶ 16.  Also in 2008, on "several occasions," Dunford told Plaintiff, "I hope you didn't blow your bridges from where you came from." *Id*. at ¶ 17.  Plaintiff purportedly inferred from such comments that he "might be fired and sent back to Puerto Rico." *Id*.

Later in 2008, while Plaintiff and another employee, James Cover, were working in a warehouse, Dunford told Plaintiff, "Go ahead and do something stupid, so I can take care of your wife." *Id*. at ¶ 21.  After this comment, Plaintiff and Cover "requested a meeting" with another supervisor to complain about Dunford's "harassing and racially motivated comments."  The Complaint, however, does not detail any comments being made to Cover,

---

[1]Although the Complaint does not clearly state that Dunford was speaking to Plaintiff, Plaintiff seemingly intends for the Court to infer that fact.

nor does it indicate whether a meeting actually took place, but does indicate that "the harassment continued." *Id*. at ¶ ¶ 22-23.

During 2009, the Complaint does not allege that Dunford made any derogatory comments.

In August 2010, on the Monday following the Puerto Rican Festival in Rochester, New York, Dunford said to Plaintiff, "Oh, you are here?"   Plaintiff replied, "Yes, why [wouldn't I be]?"   Dunford responded, "Oh, I thought that you were not going to be here because maybe you were one of the men who got arrested at the Puerto Rican festival last night,[2] that's why I'm surprised to see you here." Complaint ¶ ¶ 24-26.   Dunford allegedly made several other "degrading and harassing comments about Plaintiff's Puerto Rican heritage," though the Complaint does not indicate what was said. *Id*. at ¶ 28.

On March 23, 2011, during a "performance evaluation meeting," Plaintiff told Dunford, "I am tired of your racial comments, whenever you have something to say, tell me and let me know instead of telling other people that you have issues with my communication skills.   I know its probably hard because of my accent, but I have never had a problem with the 20 plus years I have been working with the department." Complaint ¶ 31.   Dunford responded, "I'm getting tired of you speaking Spanish with your co-workers, this is America, you gotta speak English when you live in America." *Id*. at ¶ 33.[3]   Later that day Dunford apologized to Plaintiff for the remark.

---

[2]The Court takes judicial notice of the fact that according to local news accounts, the were "about two dozen arrests" following the close of the 2010 Rochester Puerto Rican festival. See, http://rochesterathome.com/dct/62/id/504440/mid/315/Arrests-Mar-End-Of-Puerto-Rican-Festival.aspx

[3]Employers may require employees to speak English at certain times, where there is a legitimate business reason for doing so, but forcing them to speak English at all times without a good reason may indicate discriminatory animus. See, 29 C.F.R. 1606.7

After the apology, though, Plaintiff maintains that Dunford attempted to retaliate against him, by monitoring him more closely:

> Dunford started to monitor Plaintiff's work more closely and put extra pressure on Plaintiff.  Supervisor Dunford began sneaking up on Plaintiff while he was working to purposefully try to catch Plaintiff doing something wrong, however Plaintiff maintained an above average work record and avoided Supervisor Dunford.

Complaint ¶ ¶ 38-39.

On April 14, 2011, Plaintiff filed a discrimination complaint internally with the School District.  (Superintendent's Regulation -1510-R Complaint).  The complaint indicated that Dunford had made unspecified "racist and inappropriate" comments and had told Plaintiff that he should "speak English in America."  The complaint further stated that Dunford's comments "created an uncomfortable work environment."  The very next day, April 25, 2011, Plaintiff filed a complaint with the New York Human Rights Commission, purportedly because the School District had "failed to take any remedial action whatsoever with regard to [his] good faith complaints of discrimination." Complaint ¶ 43.  Subsequently, the School District moved Dunford to another department. *Id*.

On or about December 1, 2011, Plaintiff commenced this action.  The Complaint purports to assert three causes of action: 1) a hostile work environment claim, under Section 1981, against the School District and Dunford; 2) a "Monell liability" claim against the School District, pursuant to Section 1981 and 42 U.S.C. § 1983, for "creating and maintaining" a "custom, policy or practice" of "unconstitutional retaliation" and "failure to

promote minorities";[4] and 3) a claim against Dunford under the NYHRL, as an "aider and abettor."

The motion has been fully briefed.  The Court had scheduled oral argument, but upon review of the papers it finds that oral argument is unnecessary.

DISCUSSION

Defendants have moved for judgment on the pleadings, and "[t]he same standard applicable to Fed.R.Civ.P. 12(b)(6) motions to dismiss applies to Fed.R.Civ.P. 12(c) motions for judgment on the pleadings." *Bank of New York v. First Millennium, Inc.*, 607 F.3d 905, 922 (2d Cir.2010) (citation omitted).  Such standard is well settled:

> Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests. While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 1964–65, 167 L.Ed.2d 929 (2007); *see also, ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir.2007) ("To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' ") (*quoting Bell Atl. Corp. v. Twombly* ) (footnote omitted).   When applying this standard, a district court must accept the allegations contained in the

---

[4]Complaint ¶ 65.

complaint as true and draw all reasonable inferences in favor of the nonmoving party. *Burnette v. Carothers*, 192 F.3d 52, 56 (2d Cir.1999), cert. den. 531 U.S. 1052, 121 S.Ct. 657 (2000).

### Hostile Work Environment under Section 1981

Plaintiff contends that Dunford subjected him to a hostile work environment based on his race and national origin.   Section 1981 forbids race discrimination, but not discrimination based solely on national origin.

> It is established that Section 1981 prohibits discrimination based on race in the making and enforcement of contracts, and extends to private as well as state actors in that regard.  The prohibition against racial discrimination encompasses discrimination based on ancestry or ethnic characteristics.  It is also settled that Section 1981 does not prohibit discrimination on the basis of gender or religion, national origin, or age.

*Anderson v. Conboy*, 156 F.3d 167, 170 (2d Cir. 1998) (citations omitted).  "However, courts have also recognized that race and national origin discrimination claims may substantially overlap or even be indistinguishable depending on the specific facts of a case." *Deravin v. Kerik*, 335 F.3d 195, 201 (2d Cir. 2003).  "The same elements constitute a claim for employment discrimination under 42 U.S.C. § 1981 as constitute a claim under Title VII." *White v. Eastman Kodak Co.*, 368 Fed.Appx. 200, 202, 2010 WL 726629 at *1 (2d Cir. Mar. 3, 2010).

Of course, Section 1981 and other employment discrimination statutes do not establish a general civility code for the workplace. *See, e.g., Ebanks v. Neiman Marcus Group, Inc.,* 414 F.Supp.2d 320, 335 (S.D.N.Y. 2006).  Where, as here, the alleged hostile

work environment consists of comments by a supervisor, there must be more than a few isolated incidents:

> Whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances.  As the Supreme Court has stated, mere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII. *For racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity, meaning that instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments.*  Thus, whether racial slurs constitute a hostile work environment typically depends upon the quantity, frequency, and severity of those slurs, considered cumulatively in order to obtain a realistic view of the work environment.

*Schwapp v. Town of Avon*, 118 F.3d 106, 110-111 (2d Cir. 1997) (emphasis added, citations and internal quotation marks omitted).

In this case, the handful of alleged comments by Dunford over a period of four years are insufficient to create a hostile work environment. *See, Concey v. New York State Unified Court System*, No. 08 Civ. 8858(PGG), 2011 WL 4549386 at *17 (S.D.N.Y. Sep. 30, 2011) ("Accepting as true that Beirne—over a four year period—referred to Plaintiff as 'boy' on three occasions and mocked his accent on one occasion, this conduct does not rise to the level of a hostile work environment.") (collecting cases with similar facts); *see also, Wright-Jackson v. HIP Health Plan*, No. 07 Civ. 1819 (DFE), 2010 WL 624993 at *11 (S.D.N.Y. Feb. 19, 2010) (Supervisor's taunts about plaintiff's Caribbean accent and culture, and statement that "These people come here and don't even know how to talk," were insufficient to establish a hostile working environment); *compare, Pozo v. J & J Hotel Co., L.L.C.*, No. 06 Civ.2004(RCC)(AJP), 2007 WL 1376403 at *16-17  (S.D.N.Y. May 10,

2007) (Denying summary judgment where, on a daily basis over a period of five years, supervisor taunted Cuban hotel maid about her accent, told her to go back to Cuba if she didn't like the working conditions, and made her clean all bathrooms, while allowing Polish maid with better English skills to clean bedrooms). In fact, the Complaint does not indicate that in 2009 Dunford made any objectionable comments.

Moreover, many of the alleged comments were not overtly related to race. For example, the statement, "Do something stupid so that I can take care of your wife" does not imply racial animus on its face. Frankly, the Court does not know what the statement is supposed to mean, but it is not clearly racist. Similarly, the statement "I hope you didn't blow your bridges where you came from" is not overtly racist. Considering all of Dunford's alleged statements over a period of four years cumulatively, including his sporadic comments about Plaintiff's accent, his unhappiness with Plaintiff speaking Spanish to co-workers and his statement that he thought Plaintiff might have been arrested at the Puerto Rican Festival, the Court finds that they are insufficiently severe and pervasive to establish a racially-hostile working environment. *See, Stembridge v. City of New York*, 88 F.Supp.2d 276, 286 (S.D.N.Y. 2000) ("Overall, seven instances over three years does not create a work environment permeated with racial hostility").

<u>*Monell Liability Claim Against the School District*</u>

Since Plaintiff failed to state a Section 1981 discrimination claim or any constitutional claim, his *Monell* claim necessarily fails. *See, Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) ("*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it extends liability to a municipal

8

organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation.").

Even assuming *arguendo* that Plaintiff stated an underlying § 1981 claim, he has not stated a *Monell* claim against the School District.   Liberally construed, Plaintiff's Complaint purports to state a *Monell* claim against the School District based on three theories.   First, the Complaint states that the School District had a custom, policy or practice of condoning or facilitating "unconstitutional retaliation." Complaint ¶ 65.   Second, the Complaint states that the School District had a custom, policy or practice of "condoning failures to promote minority employees." *Id*. at ¶ 66.   Third, the Complaint indicates that the School District failed to provide "training, supervision and discipline," which led to "constitutional violations." *Id*. at ¶ 65.   The Complaint does not allege that the School District had a custom, policy or practice of creating a hostile work environment for Hispanic, Puerto Rican or Spanish-speaking employees. *See*, Complaint [#1] ¶ ¶ 64-66.

It is well settled that a plaintiff may establish a *Monell* claim in several ways:

[W]hen the defendant sued for discrimination under § 1981 or § 1983 is a municipality-or an individual sued in his official capacity, the plaintiff is required to show that the challenged acts were performed pursuant to a municipal policy or custom. To show a policy, custom, or practice, the plaintiff need not identify an express rule or regulation.   It is sufficient to show, for example, that a discriminatory practice of municipal officials was so persistent or widespread as to constitute a custom or usage with the force of law, or that a discriminatory practice of subordinate employees was so manifest as to imply the constructive acquiescence of senior policy-making officials.   A policy, custom, or practice may also be inferred where the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction. Liability of a municipal defendant or an individual sued in his official capacity under

§ 1981 and § 1983 cannot, however, be premised on a theory of respondeat superior.

*Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 226 (2d Cir. 2004).

Plaintiff's Complaint fails to plead facts sufficient to state a plausible claim under any of the three theories alleged. For example, the Complaint fails to allege any facts whatsoever concerning a failure to promote minority employees, and the Court therefore assumes that this allegation was left over from one of Plaintiff's counsel's prior pleadings.[5] As for supposed retaliation, the Complaint indicates only that Dunford attempted to retaliate against Plaintiff by "sneaking up on him" and trying to catch him doing something wrong. Complaint ¶ ¶ 38-39. Even assuming that such conduct amounted to retaliation, which it does not,[6] there is absolutely no factual allegation that the School District had any notice of such conduct by Dunford, or that the District condoned or ignored retaliation in general. Nor does the Complaint plausibly plead facts suggesting that the School District failed to train or supervise Dunford or other supervisors, with deliberate indifference to the

---

[5]The Complaint's introductory paragraph also indicates that "this is an action for retaliation brought pursuant to 42 U.S.C. § 1981, and 42 U.S.C. § 2000e." However, the Complaint actually does not assert a retaliation claim, nor does it assert a claim under 42 U.S.C. § 2000e. Moreover, the Complaint's closing lines indicate that Plaintiff's counsel, Ms. Agola, is appearing as "Attorney for Plaintiff David Owens," who is not a party to this action.

[6]*See, e.g., MacEntee v. IBM*, No. 11–1456, 2012 WL 1958990 at *1-2 (2d Cir. Jun. 1, 2012) ("MacEntee's retaliation action fails as a matter of law because the alleged retaliatory actions—close supervision of her time entries and workplace conduct—are not cognizable 'adverse employment actions.'"); *Arce v. Potter*, 818 F.Supp.2d 402, 411 (D.Puerto Rico 2011) (Increased supervision by supervisor was not sufficient to constitute retaliation: "[T]hese allegations are not actionable because they do not rise past the level of minor annoyances or petty slights."); *Blake v. Penn State University Greater Allegheny Campus*, Civil Action No. 09–1182, 2011 WL 841374 at *8 (W.D.Pa. Mar. 8, 2011) ("A supervisor's close scrutiny of an employee's work, while unpleasant and annoying, does not rise to the level necessary to support a Title VI I retaliation claim.").

constitutional rights of its employees. *See, Missel v. County of Monroe*, 351 Fed.Appx. 543, 545-546, 2009 WL 3617787 at *1 (2d Cir. Nov. 4, 2009) ("The allegations that Hildreth acted pursuant to a "policy," without any facts suggesting the policy's existence, are plainly insufficient.").

### *NYHRL Claim Against Dunford*

Plaintiff asserts a NYHRL claim "against Defendant Supervisor Dunford only," "as an 'aider and abettor.'" Complaint p. 12.  For the reasons already discussed, Plaintiff has failed to state a claim.

Even assuming that Plaintiff had sufficiently pleaded a hostile environment claim, Dunford cannot "aid and abet" himself in committing discrimination. *See, Alexander v. Westbury Union Free Sch. Dist.*, 829 F.Supp.2d 89, 115 (E.D.N.Y. 2011) (Cannot assert an Executive Law § 296(6) "aiding and abetting" claim against the sole alleged harasser, for aiding and abetting himself).  Some courts have questioned whether a harasser may be sued as an aider and abetter of his own conduct, in light of the Second Circuit's decision in *Tomka v. Seiler*, 66 F.3d 1295 (2d Cir. 1995). *See, e.g.,Tully-Boone v. North Shore-Long Island Jewish Hosp. Sys.*, 588 F.Supp.2d 419, 426-427 (E.D.N.Y. 2008) ("The Court is mindful that the *Tomka* interpretation of § 296(6) is not without controversy. Nevertheless, until the Second Circuit revisits the issue, *Tomka* is the law in this circuit. Accordingly, Backus may be held liable for aiding and abetting allegedly unlawful discrimination by her employer even where her actions serve as the predicate for the employer's vicarious liability.") (citations and internal quotation marks omitted).  However, in this case, Plaintiff is not asserting a NYHRL claim against the School District or anyone

11

else besides Dunford.  Therefore, there is no one for Dunford to have aided or abetted in violating NYHRL § 296. *See, Bennett v. Progressive Corp.*, 225 F.Supp.2d 190, 213-214 (N.D.N.Y. 2002) ("In order to hold an individual liable under the aiding and abetting provision, however, plaintiff must also show that the individual aided or abetted a primary violation of the NYHRL committed by another employee or the business itself .") (Citations and internal quotation marks omitted).  Accordingly, the Complaint fails to state a NYHRL claim against Dunford.

CONCLUSION

Defendants' motion [#8] for judgment on the pleadings is granted, and this action is dismissed.  The Clerk of the Court is directed to close this action.

SO ORDERED.

Dated:      July 10, 2012
            Rochester, New York

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge